UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| EVAN ALLEN, AL BALLS, BRIAN LEJA, STEPHEN MATTSON, JOHN SAUTTER, RICK SHURTLIFF, and RANDY TRANSUE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY, a Delaware corporation, Defendant. | Case No.<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..........................................................................................1

I.      NATURE OF THE ACTION ...........................................................1

II.     PARTIES ...........................................................................................4

        A.      Plaintiffs ................................................................................4

        B.      Defendant ............................................................................10

III.    JURISDICTION AND VENUE ....................................................11

IV.     FACTUAL ALLEGATIONS AS TO ALL COUNTS..................12

        A.      Manufacturers measure and advertise their own vehicles' fuel
                economy. ..............................................................................13

                1.      Manufacturers measure and use road load as an important
                        input to fuel economy testing...................................14

                2.      Inaccurate road load inputs undermine fuel economy test
                        results. ......................................................................15

        B.      Ford Overstated Fuel Economy Results for the Class Vehicles. .......17

        C.      Ford touted misleading and unreliable fuel economy ratings in
                consumer advertising for the Class Vehicles. ....................20

        D.      Ford's actions caused Class Members to suffer significant
                financial harm......................................................................25

V.      CLASS ACTION ALLEGATIONS ...............................................26

        A.      Numerosity: Federal Rule of Civil Procedure 23(a)(1) ....................28

        B.      Commonality and Predominance: Federal Rule of Civil
                Procedure 23(a)(2) and 23(b)(3) ........................................29

        C.      Typicality: Federal Rule of Civil Procedure 23(a)(3).......................30

        D.      Adequacy: Federal Rule of Civil Procedure 23(a)(4) ......................31

        E.      Declaratory and Injunctive Relief: Federal Rule of Civil
                Procedure 23(b)(2) ..............................................................31

        F.      Superiority: Federal Rule of Civil Procedure 23(b)(3) .....................31

VI.     ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED.......32

        A.      Discovery Rule Tolling .......................................................32

**TABLE OF CONTENTS**
**(continued)**

**Page**

B.     Tolling Due to Fraudulent Concealment ............................................. 33

C.     Estoppel ................................................................................................ 33

VII.    CAUSES OF ACTION ................................................................................. 34

VIII.   REQUEST FOR RELIEF ............................................................................ 60

IX.     DEMAND FOR JURY TRIAL ................................................................... 61

## INTRODUCTION

### I.   NATURE OF THE ACTION

1.   Plaintiffs Evan Allen, Al Balls, Brian Leja, Stephen Mattson, John Sautter, Rick Shurtliff, and Randy Transue, individually and on behalf of all others similarly situated (the "Class"), bring this Class Action Complaint (the "Complaint") against Ford Motor Company ("Ford" and "Defendant") seeking redress and remedy for Ford's practice of misrepresenting the fuel economy and emissions of certain vehicles, including the 2019 Ford Ranger Truck.  Plaintiffs make these allegations based, where applicable, on their personal knowledge and on information and belief.

2.   On February 18, 2019, Ford disclosed to the U.S. Environmental Protection Agency ("EPA") a "potential concern involving its U.S. emissions certification process."[1] The California Air Resources Board ("CARB") learned of Ford's disclosure through the press.[2] Additional state and federal agencies received notice thereafter.  Following the initial revelation of the "concern," the U.S. Department of Justice opened a criminal investigation into Ford's emissions certification practices.  That criminal investigation is ongoing.

---

[1] Ford Motor Co., Annual Report (Form 10-K), at 23 (Feb. 21, 2019).  *See* https://www.sec.gov/Archives/edgar/data/37996/000003799619000012/f1231201810-k.htm.

[2] Phoebe Hall Howard, *Ford launches internal investigation relating to gas mileage claims* (Feb. 21, 2019), https://www.freep.com/story/money/cars/2019/02/21/ford-stock-drops-amid-news-gas-mileage-inquiry/2944609002/.

3.      The "concern" with Ford's emissions certification process has to do with the computer modeling and testing that the company used to calculate, report, and then advertise fuel economy and emissions levels for certain vehicles (the "Class Vehicles"), including the Model Year 2019 Ford Ranger Truck.[3]  As explained herein, because Ford did not properly account for so-called "road-load" forces—forces, like friction, that slow a vehicle down during normal driving conditions—in its testing for the Class Vehicles, the tests improperly measured the Class Vehicles' fuel economy.

4.      Fuel economy is an important factor in consumers' decisions to purchase or lease a vehicle.  Fuel economy ratings are conveyed to consumers through "Monroney" stickers prominently displayed in the window of every new vehicle, through advertisements and other consumer-facing communications, and through governmental resources, among other sources.

5.      Due to its faulty testing practices, Ford misrepresented the Class Vehicles' fuel economy to consumers through these and other media.  In turn,

---

[3] Ford has begun investigating the issue by "evaluating . . . the 2019 Ranger" but has not stated that the concern is limited to that model or model year and states that it is "assessing additional vehicles as well."  *See* Ford Motor Co., *Ford Investigating Process for U.S. Emissions Certification Concerning Road Load* (Feb. 21, 2019). https://media.ford.com/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html.  The Class Vehicle definition may therefore be expanded to include additional models and model years as the case and investigation proceeds.

consumers paid money for the Class Vehicles based upon misleading information and falsely inflated fuel economy figures.

6.      Ford's own advertising shows that it understood the value and importance of fuel economy in consumers' purchase and lease decision.  For example, Ford repeatedly touted the 2019 Ranger as the "Most Fuel Efficient Gas-Powered Midsize Pickup in America."[4]  Specifically, Ford claimed that the 4x2 configuration provides "a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition.  The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks."  Similarly, with respect to the 4x4 configuration, Ford claimed  that the "Ranger returns EPA-estimated fuel economy ratings of 20 mpg city, 24 mpg highway and 22 mpg combined.  This is the best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating."[5,6]

---

[4]  *Adventure Further: All-New Ford Ranger Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America* (Dec. 11, 2018).
https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.

[5] *Id.*

[6] Notably, the margins for these "best in class" fuel economy representations are very slim.  As noted above, Ford claimed that the 4x2 Ranger achieved an EPA-certified 21 mpg city, 26 mpg highway, and 23 mpg combined.  But two competitors, the GMC Canyon 4x2 and Chevrolet Colorado 4x2, were both rated only slightly below at 20 mpg city, 26 mpg highway, and 22 mpg combined.  *See* https://www.fueleconomy.gov/feg/bymodel/2019_GMC_Canyon.shtml,

*Footnote continued on next page*

7.      Unfortunately, the fuel efficient Class Vehicles that Plaintiffs were promised and paid for are not the vehicles they ultimately received.  Unbeknownst to Plaintiffs, they have operated and continue to operate the Class Vehicles without the acclaimed "best in class" fuel efficiency, and they have therefore paid more for gasoline than they would have otherwise paid if the Class Vehicles obtained the represented fuel economy.  Had Plaintiffs known the truth about the Class Vehicles' fuel economy performance, they would not have purchased the Class Vehicles or would have paid less for them.

## II.   **PARTIES**

### A.   **Plaintiffs**

8.      Plaintiff Evan Allen (for the purposes of this paragraph, "Plaintiff"), a citizen of Louisiana, residing in Ruston, Louisiana, bought a 2019 Ford Ranger (for the purpose this paragraph, the "Class Vehicle") on or about April 27, 2019 at Jim Taylor Ford, in Ruston, Louisiana.  Plaintiff decided to buy the Class Vehicle based in part on Ford's representations regarding the Class Vehicle's fuel economy.  At the time of purchase, Plaintiff did not know that the fuel economy for the Class Vehicles were calculated using misleading modeling techniques, resulting in the Class Vehicles producing more emissions and obtaining worse fuel economy than represented.  As a result, Plaintiff has paid more for fuel during his

---

https://www.fueleconomy.gov/feg/bymodel/2019_Chevrolet_Colorado.shtml.

ownership of the Class Vehicle than he would have had it achieved the represented fuel economy, and he has been inconvenienced by having to refill the fuel tank more often than he otherwise would have. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendant's misconduct, and would not have purchased the Class Vehicle, or would have paid less for it, had Ford accurately disclosed the Class Vehicle's emissions and fuel economy.

9.    Plaintiff Randy Transue (for the purposes of this paragraph, "Plaintiff"), a citizen of Maryland, residing in Mount Airy, Maryland, bought a 2019 Ford Ranger (for the purpose this paragraph, the "Class Vehicle") on or about April 2019 at Century Ford of Mount Airy, in Mount Airy, Maryland. Plaintiff decided to buy the Class Vehicle based in part on Ford's representations regarding the Class Vehicle's fuel economy. At the time of purchase, Plaintiff did not know that the fuel economy for the Class Vehicles were calculated using misleading modeling techniques, resulting in the Class Vehicles producing more emissions and obtaining worse fuel economy than represented. As a result, Plaintiff has paid more for fuel during his ownership of the Class Vehicle than he would have had it achieved the represented fuel economy, and he has been inconvenienced by having to refill the fuel tank more often than he otherwise would have. Plaintiff has suffered a concrete injury as a direct and proximate result of Defendant's misconduct and he would not have purchased the Class Vehicle, or would have

paid less for it, had Ford accurately disclosed the Class Vehicle's emissions and fuel economy.

10.   Plaintiff Al Balls (for the purposes of this paragraph, "Plaintiff"), a citizen of Utah, residing in Logan, Utah, bought a 2019 Ford Ranger (for the purpose this paragraph, the "Class Vehicle") on or about May 2019 at Wilson Motor Company in Logan, Utah.  Plaintiff decided to buy the Class Vehicle based in part on Ford's representations regarding the Class Vehicle's fuel economy.  At the time of purchase, Plaintiff did not know that the fuel economy for the Class Vehicles were calculated using misleading modeling techniques, resulting in the Class Vehicles producing more emissions and obtaining worse fuel economy than represented.  As a result, Plaintiff has paid more for fuel during his ownership of the Class Vehicle than he would have had it achieved the represented fuel economy, and he has been inconvenienced by having to refill the fuel tank more often than he otherwise would have.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendant's misconduct and he would not have purchased the Class Vehicle, or would have paid less for it, had Ford accurately disclosed the Class Vehicle's emissions and fuel economy.

11.   Plaintiff Brian Leja (for the purposes of this paragraph, "Plaintiff"), a citizen of Michigan, residing in Omer, Michigan, leased a 2019 Ford Ranger (for the purpose this paragraph, the "Class Vehicle") on or about April 10, 2019 at

Richardson Ford in Standish, Michigan.  Plaintiff decided to lease the Class

Vehicle based in part on Ford's representations regarding the Class Vehicle's fuel

economy.  At the time of purchase, Plaintiff did not know that the fuel economy

for the Class Vehicles were calculated using misleading and inaccurate techniques,

resulting in the Class Vehicles producing more emissions and obtaining worse fuel

economy than detected in laboratory testing and represented to Plaintiff.  As a

result, Plaintiff has paid more for fuel during his lease of the Class Vehicle than he

would have had it achieved the represented fuel economy, and he has been

inconvenienced by having to refill the fuel tank more often than he otherwise

would have.  Plaintiff has suffered a concrete injury as a direct and proximate

result of Defendant's misconduct and he would not have leased the Class Vehicle,

or would have paid less for it, had Ford accurately disclosed the Class Vehicle's

emissions and fuel economy.

12.     Plaintiff Stephen Mattson (for the purposes of this paragraph,

"Plaintiff"), a citizen of Nevada, residing in Winnemucca, Nevada, bought a 2019

Ford Ranger (for the purpose this paragraph, the "Class Vehicle") on or about May

2019 at Humboldt Ford in Winnemucca, Nevada.  Plaintiff decided to buy the

Class Vehicle based in part on Ford's representations regarding the Class Vehicle's

fuel economy.  At the time of purchase, Plaintiff did not know that the fuel

economy for the Class Vehicles were calculated using misleading modeling

techniques, resulting in the Class Vehicles producing more emissions and obtaining worse fuel economy than represented.  As a result, Plaintiff has paid more for fuel during his ownership of the Class Vehicle than he would have had it achieved the represented fuel economy, and he has been inconvenienced by having to refill the fuel tank more often t6han he otherwise would have.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendant's misconduct and he would not have purchased the Class Vehicle, or would have paid less for it, had Ford accurately disclosed the Class Vehicle's emissions and fuel economy.

13.     Plaintiff John Sautter (for the purposes of this paragraph, "Plaintiff"), a resident of Montana, residing in Malta, Montana, bought a 2019 Ford Ranger (for the purpose this paragraph, the "Class Vehicle") on or about January 31, 2019, at Bison Ford in Great Falls, Montana.  Plaintiff decided to buy the Class Vehicle based in part on Ford's representations regarding the Class Vehicle's fuel economy.  At the time of purchase, Plaintiff did not know that the fuel economy for the Class Vehicles were calculated using misleading and inaccurate techniques, resulting in the Class Vehicles producing more emissions and obtaining worse fuel economy than detected in laboratory testing and represented to Plaintiff.  As a result, Plaintiff has paid more for fuel during his ownership of the Class Vehicle than he would have had it achieved the represented fuel economy, and he has been

inconvenienced by having to refill the fuel tank more often than he otherwise would have.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendant's misconduct and he would not have purchased the Class Vehicle, or would have paid less for it, had Ford accurately disclosed the Class Vehicle's emissions and fuel economy.

14.     Plaintiff Rick Shurtliff (for the purposes of this paragraph, "Plaintiff"), a citizen of Washington, residing in Ridgefield, Washington, bought a 2019 Ford Ranger (for the purpose this paragraph, the "Class Vehicle") on or about April 2019 at Titus-Will Ford in Tacoma, Washington.  Plaintiff decided to buy the Class Vehicle based in part on Ford's representations regarding the Class Vehicle's fuel economy.  At the time of purchase, Plaintiff did not know that the fuel economy for the Class Vehicles were calculated using misleading modeling techniques, resulting in the Class Vehicles producing more emissions and obtaining worse fuel economy than represented.  As a result, Plaintiff has paid more for fuel during his ownership of the Class Vehicle than he would have had it achieved the represented fuel economy, and he has been inconvenienced by having to refill the fuel tank more often than he otherwise would have.  Plaintiff has suffered a concrete injury as a direct and proximate result of Defendant's misconduct and he would not have purchased the Class Vehicle, or would have

paid less for it, had Ford accurately disclosed the Class Vehicle's emissions and fuel economy.

B. **Defendant**

15.     Defendant Ford Motor Company ("Ford") is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan 48126.

16.     With approximately 196,000 employees worldwide, Ford is in the business of designing, manufacturing, and distributing motor vehicles under the Ford and Lincoln brands.  It is one of the "Big Three" American automakers (with General Motors and Fiat Chrysler).  In 2018 alone, Ford sold approximately 5,982,000 new vehicles worldwide.[7]

17.     As of April 2019, Ford has designed, manufactured, distributed, offered for sale, sold, and leased more than 15,000 Class Vehicles with the knowledge and intent to market, sell, and lease them in all 50 states and the District of Columbia.[8]  Franchised dealers act as Ford's agents in selling and leasing vehicles and disseminating vehicle information provided by Ford to customers.  In

---

[7] *Creating Tomorrow, Together: Ford Motor Company – 2018 Annual Report* (March 15, 2019) https://corporate.ford.com/content/dam/corporate/en/company/corporate-governance/2018-Annual-Report.pdf.

[8] Alexander Stoklosa, *Ford Ranger Sales off to a Slow Start – It's Even Being Beaten by the Nissan Frontier* (May 3, 2019) https://www.caranddriver.com/news/a27358644/ford-ranger-pickup-sales-2019/.

addition, Ford provides financial services—namely, auto loans and leases—through Ford Motor Credit Company LLC.

18.     Ford developed and disseminated owners' manuals, warranty booklets, product brochures, and marketing and other promotional materials relating to the Class Vehicles, with the intent that such documents should be purposely distributed throughout all 50 states and the District of Columbia. Ford is engaged in interstate commerce, selling vehicles through its franchised dealer network in every state of the United States.

## III.   JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs. Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*. The Court also has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367. The Court has personal jurisdiction over Ford pursuant to 18 U.S.C. §§ 1965(b) and (d).

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in

this District, and because Ford caused harm to Class members residing in this District.  Ford marketed, advertised, sold and leased the Class Vehicles from franchise dealers located in this District, and, thus, a substantial part of Ford's misconduct occurred in this District, including Ford's decision-making, design, promotion, marketing, distribution, and sale of the Class Vehicles.

## IV.    FACTUAL ALLEGATIONS AS TO ALL COUNTS

21.    This case centers on Ford's faulty in-house measurement and subsequent misrepresentation of the Class Vehicles' fuel efficiency.

22.    In short, Ford tested the Class Vehicles in a laboratory and—in spite of clear requirements that it do so—did not properly account for forces that act to reduce the Class Vehicles' fuel economy on the road, but which do not impact fuel economy in the stationary environment of the laboratory.  Due to this discrepancy, the ratings Ford measured in the lab, reported to the regulators, and then featured in its consumer-facing marketing materials did not reflect the Class Vehicles' actual fuel economy performance.  As such, Class members did not get the vehicles, or the fuel economy, they were promised and paid for.[9]

---

[9] This is not the first time that Ford has misstated or miscalculated its vehicles' fuel efficiency. Ford faced a lawsuit after it overstated the fuel efficiency of its Ford Fusion and C-MAX in recent years.  Ford "launched a massive and misleading advertising campaign designed to convey to the auto-buying public that two of its new 2013 hybrid models … had made a quantum leap in fuel economy." *See In re: Ford Fusion and C-MAX Fuel Economy Litigation*, 7:13-md-02450-KMK, Dkt. 51 Consolidated Amended Class Action Complaint) (S.D.N.Y. Oct. 15, 2013).  The case settled, and Ford was required to "lower[] the gas mileage ratings on several hybrid cars by one to seven miles per gallon."  *See id.* at Dkt. 151 (Stipulated Order Dismissing

*Footnote continued on next page*

A.   **Manufacturers measure and advertise their own vehicles' fuel economy.**

23.   For the vast majority of vehicles sold in the United States, fuel economy ratings are derived from testing conducted in-house by the vehicle manufacturer.  Although conducted by the manufacturer, the testing must follow EPA-regulated procedures designed to ensure accuracy.  In a small number of cases, the EPA conducts confirmatory testing to ensure the reported figures are accurate, but the agency otherwise accepts the manufacturer's reporting and certification of its results.[10]

24.   The EPA testing protocol involves driving a vehicle over driving patterns (or "drive cycles") in a laboratory on a flat dynamometer machine ("dyno") akin to a treadmill.

25.   Although conducted in a lab, the drive cycles are designed to simulate driving conditions that are "typical" of those in the real world, so that the test results present an accurate measure of the vehicle's actual performance.[11]  For example, engineers adjust the amount of energy required to move the rollers on the dyno to mimic the force exerted on the vehicle by meeting wind resistance on the

---

Consolidated Second Amended Complaint); *see also* Natasha Singer, Ford is Investigation Emissions and Fuel Efficiency Data (Feb. 21, 2019), https://www.nytimes.com/2019/02/21/business/ford-emissions.html.

[10] *U.S. Department of Energy, Office of Energy Efficiency & Renewable Energy: How Vehicles are Tested*, https://www.fueleconomy.gov/feg/how_tested.shtml.

[11] *Id.*

*Footnote continued on next page*

road—a force which will not otherwise influence vehicles in the static conditions of the laboratory.[12]

### 1. Manufacturers measure and use road load as an important input to fuel economy testing.

26. One variable adjusted in the test to simulate actual driving conditions is referred to as the "road load." The road load is a measure of the forces that affect a vehicle while driving during normal, on-road driving conditions at a constant speed on a level surface. *See* 40 CFR § 1066.301.[13] This includes, for example, the drag of the air and tire resistance on the road surface and other effects of friction. Because these forces are not present in the laboratory, the testing protocol requires the manufacturer to simulate the road load forces in its testing procedures. *See* 40 CFR § 1066.301. Without adequately accounting for road load, laboratory testing will overestimate fuel efficiency.

27. It is the manufacturer's responsibility to calculate and use the appropriate settings to accurately mimic actual road load forces for a given vehicle in its lab testing.

---

[12] *Id.*

[13] Byron Bunker, *United States Environmental Protection Agency letter re: Determination and Use of Vehicle Road-Load Force and Dynamometer Settings*, at 2 (Feb. 23, 2015), https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1.

28.     Because it is difficult to measure road load directly, the EPA has approved a process known as the "coast down" method to help determine a vehicle's road load.

29.     Coast down tests were developed by the Society of Automotive of Engineers ("SAE") and are incorporated by reference in 40 CFR § 1066.1010.  In a coast down test, a vehicle is first warmed up for a minimum of 30 minutes to allow the vehicle tires and driveline to reach a stabilized temperature.  The test vehicle is then brought to a high speed on a flat, straight, and dry road with a similar composition to a common road service.  It is then set to coast in neutral while its speed is periodically measured.

30.     In addition to the coast down test, manufacturers and engineers also use analytical modeling techniques to estimate a vehicle's road load.  40 CFR § 1066.301.

### 2.    Inaccurate road load inputs undermine fuel economy test results.

31.     Once a vehicle's actual road load is determined through coast down testing and/or analytical modeling, those conditions can be simulated in the lab when conducting other tests, including those used to measure fuel economy.

32.     To measure fuel economy, a hose is connected to the vehicle's tailpipe to collect engine exhaust during the test cycles.  The carbon in the exhaust is then

measured to calculate the amount of fuel burned during the test.[14]  This amount is

then divided into the distance driven to arrive at the fuel economy, commonly

represented in terms of "Miles per Gallon" or "MPG."

33.     The data is also adjusted to reflect "real world" conditions present

during "city" driving and "highway" driving, and the "combined" fuel economy

figure represents the average of the city and highway values with weights of 55%

and 45%, respectively.  These fuel economy ratings, as measured by the

manufacturer in this way, are featured, among other places, on the Monroney label

(commonly referred to as the "window sticker").  If the fuel efficiency represented

on the Monroney label is later determined to be inaccurate by confirmatory testing

or otherwise, the EPA requires manufacturers to revise the sticker to provide

consumers with accurate information.[15]

34.     Prior to selling a vehicle in the United States, the manufacturer must

apply for and obtain a Certificate of Conformity ("COC") from the EPA.  To do so,

the manufacturer must disclose both the calculated fuel economy and the road load

force specification used in vehicle testing as well as a description of the test

procedures or analytical methods used.[16]  If the application is approved, the EPA

---

[14] *U.S. Department of Energy, Office of Energy Efficiency & Renewable Energy: How Vehicles are Tested*, https://www.fueleconomy.gov/feg/how_tested.shtml.

[15] *U.S. Environmental Protection Agency: Data on Cars used for Testing Fuel Economy*, https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-used-testing-fuel-economy.

[16] *Byron Bunker, United States Environmental Protection Agency letter re: Determination and*
*Footnote continued on next page*

will issue a COC for that vehicle, certifying that the vehicle comports with requirements for sale in the United States.

35. COCs are conditioned on the understanding that the vehicles produced are, in all material respects, as described in the manufacturer's application for certification (*see* 40 CFR § 86.1848-01).[17] The EPA may deny, suspend, or revoke a COC if it finds that production vehicles have actual road-load forces that differ substantially from the road-load specification used in the application for certification. *See* 40 CFR § 86.1850-01(b). Manufacturers that fail to provide accurate vehicle road-load specification information in their applications for certification may also be subject to enforcement action, including civil penalties.[18]

## B. Ford Overstated Fuel Economy Results for the Class Vehicles.

36. By at least September 2018, Ford was on notice that it was not accurately representing the Class Vehicles' fuel economy. Indeed, in that month, several Ford employees used an internal reporting "Speak Up" system to raise their concerns about the testing practices used at Ford to measure and report its vehicles' fuel economy.

---

*Use of Vehicle Road-Load Force and Dynamometer Settings*, at 2 (Feb. 23, 2015), https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1.

[17] *Id.*

[18] *Id.*

*Footnote continued on next page*

37.     Ford waited many months after this internal whistleblowing effort before it disclosed these concerns to the EPA in February, 2019.[19]  At that time, Ford admitted it was looking into issues relating to its "computer-modeling methods and calculations used to measure fuel economy and emissions."[20]  Ford also referenced these "potential concerns" in its Form 10-K filing for fiscal year 2018, calling it a "potential concern involving its U.S. emissions certification process."[21]

38.     Not long thereafter, Ford revealed in its April 25, 2019, SEC filing that the investigation into its fuel economy testing was proceeding and "focuses on issues relating to road load estimations, including analytical modeling and coast down testing."[22]

39.     Ford is now under criminal investigation by the United States Department of Justice for its emissions certification practices.[23]

---

[19] Ford Motor Co., Annual Report (Form 10-K), at 23 (Feb. 21, 2019), https://www.sec.gov/Archives/edgar/data/37996/000003799619000012/f1231201810-k.htm.

[20] Tiffany Hsu, *Ford Says Justice Dept. Has Opened Criminal Inquiry Into Emissions Issues* (April 26, 2019), https://www.nytimes.com/2019/04/26/business/ford-emissions-criminal-investigation.html.

[21] Ford Motor Co., Quarterly Report (Form 10-Q), at 70 (1st Quarter 2019), https://www.sec.gov/Archives/edgar/data/37996/000003799619000026/f0331201910-q.htm.

[22] *Id.*

[23] *Id.*

*Footnote continued on next page*

40.     Thus far, Ford notes in its public statements that while the 2019
Ranger is the "first" vehicle it is evaluating for these fuel economy testing practice
issues, "additional vehicles" will be part of the assessment going forward as well.[24]

41.     In the wake of these public admissions about the 2019 Ranger, Andre
Smirnov—a software engineer and blogger for The Fast Lane Truck website—
drove a 2019 Ford Ranger from California to Colorado to test its real-world fuel
economy versus Ford's reported results.  On that trip, Smirnov observed the
vehicle achieved an average of only 19.5 MPG, far from the 24 MPG combined
MPG certified to the EPA.[25]  Later, Smirnov noted that certain factors such as
uphill slope may have biased those test results.[26]

42.     The Fast Lane Truck then tested the 2019 Ranger again, this time on
its 98-mile "fuel economy loop" which is designed to be almost entirely highway
driving.  In this test, too, the vehicle did not even come close to the highway fuel
economy Ford advertised: it reached 20 MPG, nearly 25% less than the 26 MPG

---

[24] Kim Pittel, *Ford Investigating Process for U.S. Emissions Certification Concerning Road Load* (Feb. 21, 2019),
http://www.campaign.ford.com/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html.

[25] Andre Smirnov, *Real-world 2019 Ford Ranger Fuel Economy: Here is the Unexpected Result after a 1,000 Road Trip (Video)* (Feb. 23, 2019), https://www.tfltruck.com/2019/02/real-world-2019-ford-ranger-fuel-economy-here-is-the-unexpected-result-after-a-1000-mile-road-trip-video/.

[26] Stephen Elmer, *EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What does It Really Get at 70 MPH (Video)* (Mar. 19, 2019), https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/.

*Footnote continued on next page*

Ford promised.[27]  Interestingly, the track drivers observed that "the Ranger's trip computer told us that the truck managed just over 25 mpg, though our math at the fuel pump did not add up to the same number."[28]

### C.  Ford touted misleading and unreliable fuel economy ratings in consumer advertising for the Class Vehicles.

43.     Fuel economy, environmental friendliness, and the range of miles between fuel tank refills are important factors in consumer decisions to purchase or lease a vehicle.[29] Ford targeted these preferences in their misleading advertising for the Class Vehicles.

44.     As explained above, new vehicles include a window or "Monroney" sticker summarizing information about the vehicle, including its fuel economy.

45.     An example of a Monroney label for a Class Vehicle is included below.  As the image below makes clear, the Ranger boasts EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway, and 23 mpg combined for 4x2 trucks:

---

[27] https://youtu.be/W6iLtygCC7Y, embedded in Stephen Elmer, *EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What does It Really Get at 70 MPH (Video)* (Mar. 19, 2019), https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/.

[28] *Id.*

[29] *See, e.g.*, Keith Barry, *Car Buyers Say They'd Pay for Better Fuel Economy*, Consumer Reports (June 12, 2018) available at https://www.consumerreports.org/fuel-economy-efficiency/car-buyers-say-they-would-pay-for-better-fuel-economy-survey/ (discussing study conducted by conducted by the American Council for an Energy-Efficient Economy (ACEEE) which found that "[t]hose who said they plan to buy a large SUV or pickup truck, as opposed to other types of vehicles, said they were willing to pay the most for fuel economy").



46.     The fuel economy statistics disclosed in Monroney stickers for the

Class Vehicles were false because, as explained above, they were calculated using

inaccurate and misleading techniques that served to underestimate the forces that

would act to slow the vehicle down (and thus impact fuel economy) in the real

world.

47.     In addition to the Monroney labels, Ford advertised the Class Vehicles

and otherwise supplied consumers with information about them, including

incorrect fuel economy statistics, on its websites, in brochures, and in other

marketing materials.

48.     For example, in its recent "Plan for Reducing Vehicle Emissions,"

Ford claimed that "we have followed an ambitious plan to improve fuel economy

and reduce CO2 emissions across our product portfolio over the past decade and remain committed to emissions reductions and electrification over the long term."[30]

49. Ford's advertising about the 2019 Ranger fit this narrative, but failed to disclose the flawed methodology used to calculate its test results.

50. In a December 2018 Press Release, Ford touted the 2019 Ranger as the "most fuel-efficient gas-powered midsize pickup in America" with "EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined," and emphasized the truck's "superior" city and "unsurpassed" combined fuel economy ratings. At the same time, Ford claimed the "EcoBoost" gasoline engine delivers "best-in-class 310 lb.-ft torque and best in class towing capacity." This combination of features, according to Ford, makes the Ranger the "no-compromise choice for power, technology, capability and efficiency whether the path is on road or off." [31]

---

[30] Ford, *Sustainability 2019/219: Our Future is Motion*, https://corporate.ford.com/microsites/sustainability-report-2017-18/customers-products/reducing-emissions/plan.html.

[31] *Adventure Further: All-New Ford Ranger Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America* (Dec. 11, 2018). https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.



**ADVENTURE FURTHER: ALL-NEW FORD RANGER RATED MOST FUEL-EFFICIENT GAS-POWERED MIDSIZE PICKUP IN AMERICA**

DEC 11, 2018 | DEARBORN, MICH.

- With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America
- All-new Ranger's proven 2.3-liter EcoBoost® gasoline engine beats the V6 gasoline engines from its midsize truck competitors to deliver best-in-class 310 lb.-ft. of torque and best-in-class towing capacity
- Ranger is the no-compromise choice for power, technology, capability and efficiency whether the path is on road or off

51.     As yet another example, Todd Eckert, Ford truck group marketing manager, emphasized that the "Ranger will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[32]

---

[32] *Id.*

*Footnote continued on next page*

52.     Similarly, in the product information book for the Ranger, Ford claimed the Ranger achieved "21 mpg city" making it the "most fuel-efficient gas-powered midsize pickup available."[33]   In a brochure for the 2019 Ranger, Ford likewise emphasized the "unsurpassed gas" and claimed that the Ranger is "one of the most versatile, powerful and efficient gas powertrains in its class."



53.     Nowhere in the above, or in its other consumer-facing materials, did Ford disclose that this "unsurpassed gas" rating was calculated in a way that did

---

[33] Ford Product Information Book, *The All-New 2019 Ford Ranger: The Ultimate Adventure Gear,* p. 2.

not accurately account for real world driving conditions and thus overestimated and inflated the reported fuel economy.

**D.** **Ford's actions caused Class Members to suffer significant financial harm.**

54. Because Ford misrepresented the Class Vehicles' real-world fuel economy, Class members suffered economic damages. They did not get the vehicles they paid for and reasonably expected to receive and, as a result, spent (and will continue to spend) more on gasoline than they otherwise would have.

55. Ford's fraud was also bad for the environment. Using more fuel results not just in financial harm to the Class members, but also in the emission of more pollutants such as carbon dioxide ("$CO_2$"). $CO_2$ is dangerous. While it has long been known that $CO_2$ emissions contribute to climate change, $CO_2$ emissions can also be deadly. In 2008, Stanford University conducted the first study connecting increased $CO_2$ emissions to deaths. This study concluded that upward of 20,000 air-pollution-related deaths per year per degree Celsius may be due to this greenhouse gas.[34] Increases in $CO_2$ emissions have immediate and deleterious effects on health and the environment.

56. Had Ford accurately disclosed to Plaintiffs and the Class the actual fuel economy performance of the Class Vehicles, and the impact that additional

---

[34] Louis Bergeron, *Stanford Report: Study links carbon dioxide emission to increased deaths* (Jan. 3, 2019), https://news.stanford.edu/news/2008/january9/co-010908.html.

fuel use would have on vehicle emissions, they would not have purchased or leased those vehicles, or would have paid substantially less for them than they did.

## V.   CLASS ACTION ALLEGATIONS

57.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring this action on behalf of themselves and a Nationwide Class and Statewide Classes (collectively, "the Class"), defined as:

**Nationwide Class:**

>     All persons and entities in the United States, including its
>     territories, who purchased or leased a Class Vehicle.

58.    The phrase "persons or entities," as used in this Complaint and the Nationwide and State Class definitions, includes, but is not limited to, independent (non-Ford franchise) automobile dealers in the United States (including its territories and the District of Columbia) with one or more Class Vehicles in their inventory.

59.    In addition to the Nationwide Class, and pursuant to Federal Rules of Civil Procedure Rule 23(c)(5), Plaintiffs seek to represent the following State Classes or subclasses as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

**Louisiana State Class:**

>     All persons or entities that purchased or leased a Class
>     Vehicle within Louisiana or that purchased or leased a

Class Vehicle and reside in Louisiana.

**Maryland Sate Class:**

All persons or entities that purchased or leased a Class Vehicle within Maryland or that purchased or leased a Class Vehicle and reside in Maryland.

**Michigan State Class:**

All persons or entities that purchased or leased a Class Vehicle within Michigan or that purchased or leased a Class Vehicle and reside in Michigan.

**Montana State Class:**

All persons or entities that purchased or leased a Class Vehicle within Montana or that purchased or leased a Class Vehicle and reside in Montana.

**Nevada State Class:**

All persons or entities that purchased or leased a Class Vehicle within Nevada or that purchased or leased a Class Vehicle and reside in Nevada.

**Utah State Class:**

All persons or entities that purchased or leased a Class Vehicle within Utah or that purchased or leased a Class Vehicle and reside in Utah.

**Washington State Class**

All persons or entities that purchased or leased a Class Vehicle within Washington or that purchased or leased a Class Vehicle and reside in Washington.

60.     Excluded from the Classes are: (A) Defendant, including any entity or division in which Defendant has a controlling interest, as well as its agents, representatives, officers, directors, employees, trustees, parents, children, heirs,

assigns, and successors, and other persons or entities related to, or affiliated with Defendant; (B) the Judge(s) to whom this case is assigned, their staff, and their immediate families; and (C) governmental entities.

61.     Plaintiffs reserve the right to amend the definition of the Class(es) if discovery and further investigation reveal that the Class(es) should be expanded, divided into additional subclasses under Rule 23(c)(5), or modified in any other way.

62.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using similar evidence as would be used in individual actions alleging the same claims.

63.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23 and satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of its provisions.

A.     <u>**Numerosity: Federal Rule of Civil Procedure 23(a)(1)**</u>

64.     The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  Plaintiffs are informed and believe that there are at least 15,000 Class members across the United States.  The precise number and identities of Nationwide Class and State

Class members may be ascertained from Defendant's records and motor vehicle registration data.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**B.**     **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**

65.     This action involves common questions of law and fact that predominate over any questions affecting individual Class members, including, without limitation:

      a.     Whether Ford engaged in the conduct alleged herein, including but not limited to, inflating the fuel economy of the Class Vehicles in submissions to the regulators and communications to the Class;

      b.     Whether Ford knew or should have known that the advertised fuel economy rating for the Class Vehicles was inaccurate;

      c.     Whether the sale or lease of Class Vehicles are consumer transactions;

      d.     Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

      e.     Whether the Class Vehicles' actual fuel economy rating is a material fact, and if so, whether Ford's failure to advertise the Class Vehicles' actual fuel economy rating tends to mislead or deceive a consumer;

      f.     Whether Class members could reasonably have known that the Class Vehicles' advertised fuel economy rating was different from the actual fuel economy rating at the point of purchase;

g.   Whether Plaintiff and the other Class members overpaid for their Class Vehicles as a result of Ford's misconduct;

h.   Whether Plaintiff and the other Class members have been forced to spend more on gasoline than they otherwise would have as a result of Ford's misconduct; and

i.   Whether Plaintiffs and the other Class members are entitled to any other damages or monetary relief and, if so, in what amount.

## C.   Typicality: Federal Rule of Civil Procedure 23(a)(3)

66.   Plaintiffs' claims are typical of the claims of the Class members whom they seek to represent under Fed. R. Civ. P. 23(a)(3), because Plaintiffs and each Class member purchased or leased a Class Vehicle and were comparably injured through Ford's uniform conduct of misrepresenting the fuel economy of the Class Vehicles.  Neither Plaintiffs nor the other Class members would have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the defects at issue herein.  Moreover, all Plaintiffs and Class members paid more for gasoline than they would have if the Class Vehicles performed as advertised and were inconvenienced by more frequent fill-ups.  Furthermore, Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.  Plaintiffs' claims are also based upon the same legal theories as the claims of the other Class members.

### D.     <u>Adequacy: Federal Rule of Civil Procedure 23(a)(4)</u>

67.     Plaintiffs will fairly and adequately represent and protect the interests of the Class members as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs have retained counsel competent and experienced in complex class action litigation, including vehicle emissions litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously.  Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other Class members. Therefore, the interests of the Class members will be fairly and adequately protected.

### E.     <u>Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)</u>

68.     Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

### F.     <u>Superiority: Federal Rule of Civil Procedure 23(b)(3)</u>

69.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its management.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims

against Defendant, so it would be impracticable for members of the Class to individually seek redress for Defendant's wrongful conduct.

70.    Even if Class members could afford individual litigation, individual litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   ANY APPLICABLE STATUTES OF LIMITATION ARE TOLLED

### A.    <u>Discovery Rule Tolling</u>

71.    Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have reasonably discovered that Ford was concealing and misrepresenting the Class Vehicle's true emissions and fuel economy.  Plaintiffs and the other Class members could not have reasonably discovered, and did not know of facts that would have caused a reasonable person to suspect, that Ford failed to report information within their knowledge to federal and state authorities, dealerships, or consumers until—at the earliest—February 21, 2019, when it was reported for the first time that Ford had launched an investigation into its own emissions and fuel efficiency testing practices involving the Class Vehicle.

72.     Any otherwise-applicable statutes of limitation have therefore been tolled by the discovery rule with respect to all claims.

**B.      <u>Tolling Due to Fraudulent Concealment</u>**

73.     Ford knew that it was concealing the true fuel economy and emissions of the Class Vehicles, but continued to distribute, sell, and/or lease Class Vehicles to Plaintiffs and the class members.  In so doing, Ford concealed and denied the existence of false fuel economy and emissions, and/or failed to notify Plaintiffs and the Class members about the true nature of the Class Vehicle.

74.     Instead of disclosing its deception, Ford falsely represented that the Class Vehicles had higher fuel economy and lower emissions than advertised, and falsely represented that it was a reputable manufacturer whose representations could be trusted.

75.     Any otherwise-applicable statutes of limitation have therefore been tolled by Ford's exclusive knowledge and active concealment of the facts alleged herein.

**C.      <u>Estoppel</u>**

76.     Ford was and is under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicle, including their compliance with applicable federal and state law and their true fuel economy.

77.     However, Ford did not disclose accurate fuel economy figures and did not correct their disclosures with respect to the Class Vehicles.  Instead, Ford actively concealed and misrepresented the true character, quality, and nature of the Class Vehicles.

78.     Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.    CAUSES OF ACTION

### COUNT I
### Violation of Magnuson Moss Warranty Act
### 15 U.S.C. §§ 2301, *et seq.*
### (On Behalf of the Nationwide Class)

79.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

80.     Plaintiffs bring this Count on behalf of themselves and the Nationwide Class.

81.     This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act (for the purpose of this Count, the "Act") by virtue of 28 U.S.C. § 1332(a)-(d).

82.     Plaintiffs and the other Class members are "consumers" who purchased "consumer products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Class Vehicles for personal, family, or household purposes.

83.     Ford is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5) because the company regularly sells Ford vehicles accompanied by written Limited Warranties.

84.     The Class Vehicles are "consumer products" within the meaning of the Act.  15 U.S.C. § 2301(1).

85.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

86.     The amount in controversy of the Plaintiffs' individual claims meets or exceeds $25.00 in value.  In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

87.     Ford provided Plaintiffs and the members of the Nationwide Class with written and implied warranties, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

88.     Ford breached these written and implied warranties as described in detail above. Ford expressly warranted in advertisements and consumer-facing communications, including on the window stickers themselves that were affixed to the Class Vehicles, that the Class Vehicles achieve a fuel economy rating of specific MPGs.  Ford impliedly warranted that the Class Vehicles would conform

to the descriptions promised in Ford's advertisements and consumer-facing communications.

89. Ford breached these warranties. Ford breached these express warranties because the Class Vehicles did not achieve the specific fuel economy rating Ford advertised. Moreover, Ford breached these implied warranties because the Class Vehicles did not and do not conform to the descriptions advertised.

90. The terms of the warranties became part of the basis of the bargain between Ford and the Plaintiffs and all other Class members when deciding to purchase a Class Vehicle.

91. Plaintiffs and each of the other Nationwide Class members have had sufficient direct dealings with either Ford or its agents (including Ford dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and each of the other Nationwide Class members, on the other hand. Moreover, privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Ford and its dealers. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

92.     Because Ford knew of the defect at the time of the sale, it has waived any opportunity to cure.

93.     As a direct and proximate result of Ford's breach of written warranties and implied warranties of merchantability, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

94.     Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages permitted by law, including without limitation compensation for the additional fuel required to drive the Class Vehicles, compensation for the inconvenience associated with the additional fill-ups, and the monetary difference between the Class Vehicles as warranted and as sold, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

**COUNT II**
**Fraud**
**(On Behalf of the Nationwide Class or, in the Alternative, the State Classes)**

95.     Plaintiffs incorporate by reference all allegations in this Complaint as though fully set forth herein.

96.     Plaintiffs bring this Count on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Classes.

97.     Ford had a duty to disclose the true fuel economy to the public.

98.     As alleged above, however, Ford intentionally concealed and suppressed material facts concerning the fuel economy of the Class Vehicles to defraud and mislead the Class about the true nature of the Class Vehicles.

99.     Ford's false representations and omissions were material to consumers.

100.    Plaintiffs and Class members reasonably relied on Ford's deception, and Ford intended that they would so rely.  Plaintiffs and Class members had no way of discerning that Ford was deceiving them.

101.    Plaintiffs and Class members were not aware of the concealed and misrepresented material facts referenced above, and they would not have acted as they did had they known the truth.

102.    As a direct and proximate result of Ford's fraudulent scheme, Plaintiffs and Class members sustained damages.  Had they known the truth, they would not have purchased the Class Vehicles or would have paid less for them. They now own or lease Class Vehicles that are worth less and cost more to drive and maintain than the vehicles that were advertised or marketed.

103.    Ford is liable to Plaintiffs and Class members for damages in an amount to be proven at trial.  Moreover, because Ford acted wantonly, maliciously, oppressively, recklessly, deliberately, and with intent to defraud Plaintiff and Class members for the purpose of enriching itself at Plaintiff and Class members'

detriment, Ford's conduct warrants punitive and exemplary damages in an amount to be determined at trial.

## COUNT III
### Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law
### (LA. REV. STAT. § 51:1401, *et seq.*)

104.    Plaintiff Evan Allen (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Louisiana State Class against Ford.

105.    Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

106.    Ford, Plaintiff, and the Louisiana State Class members are "persons" within the meaning of LA. REV. STAT. § 51:1402(8).

107.    Plaintiff and Louisiana State Class members are "consumers" within the meaning of LA. REV. STAT. § 51:1402(1).

108.    Ford engaged in "trade" or "commerce" within the meaning of LA. REV. STAT. § 51:1402(9).

109.    The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana CPL) makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405(A).

110.    Ford through its agents, employees, and/or subsidiaries, participated in misleading, false, or deceptive acts that violated the Louisiana CPL. In the course of its business, Ford intentionally or negligently concealed and suppressed

material facts concerning the Class Vehicles, including failing to disclose that the Class Vehicles did not have the advertised and certified fuel economy of specific MPGs.

111.    In so doing, and by marketing, offering for sale, and selling the defective Class Vehicles, Ford engaged in one or more of the following unfair or deceptive acts or practices as defined in LA. REV. STAT. § 51:1405(A):

a.    Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

b.    Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

c.    Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

d.    Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

e.    Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

112.    Ford's concealment of the true characteristics of the Class Vehicles were material to Plaintiffs and the Louisiana State Class, as Ford intended. Had they known the truth, Plaintiffs and the Louisiana State Class would not have purchased or leased the Class Vehicles, or would have paid significantly less for them.

113.    Plaintiffs and Louisiana State Class members had no way of discerning that Ford's representations were false and misleading, or otherwise learning the facts that Ford had concealed or failed to disclose.  Plaintiffs and Louisiana State Class members did not, and could not, unravel Ford's deception on their own.

114.    Ford had an ongoing duty to Plaintiffs and the Louisiana State Class to refrain from unfair and deceptive practices under the Louisiana CPL in the course of its business.  Specifically, Ford owed Plaintiffs and Louisiana State Class members a duty to disclose all the material facts concerning the Class Vehicles, including their actual fuel economy, because Ford possessed exclusive knowledge, intentionally concealed it from Plaintiffs and the Louisiana State Class, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

115.    Plaintiffs and Louisiana State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's concealment, misrepresentations, and/or failure to disclose material information.

116.    Pursuant to LA. REV. STAT. § 51:1409, Plaintiffs and the Louisiana State Class seek an order enjoining Ford's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Louisiana CPL.

## COUNT IV
## Redhibition
## (LA. CIV. CODE ART. 2520, *et. seq.* and 2545)

117.    Plaintiff Evan Allen (for the purpose of this section, "Plaintiff")

brings this action on behalf of himself and the Louisiana State Class against Ford.

118.    Plaintiff realleges and incorporates by reference all paragraphs as

though fully set forth herein.

119.    Under Louisiana law, the seller and manufacturer warrants the buyer

against redhibitory defects or vices in the thing sold. LA. CIV. CODE ART. 2520.

A defect is redhibitory under two circumstances. First, a defect is redhibitory when

it renders the thing useless, or renders its use so inconvenient that it must be

presumed that a buyer would not have bought the thing had he known of the

defect. *Id.* The existence of such a defect gives a buyer the right to obtain

rescission of the sale. *Id.* Second, a defect is redhibitory when it diminishes the

usefulness or the value of the thing so that it must be presumed that a buyer would

still have bought it, but for a lesser price. *Id.* The existence of such a defect

entitles the buyer to a reduction in the price. *Id.*

120.    Ford defectively designed, manufactured, sold, or otherwise placed in

the stream of commerce Class Vehicles that are defective for the reasons alleged

herein.

121.    Ford has known of the defects that result from the defects, as alleged herein, and failed to adequately address those concerns.

122.    Ford is responsible for damages caused by the failure of its products to conform to well-defined standards.  In particular, the Class Vehicles contain vices or defects which have rendered them useless or their use so inconvenient that reasonable buyers would not have purchased them had they known of the defects, or at the least, would not have paid as much for the Vehicles as they did.  Plaintiff and the Louisiana State Class members are entitled to obtain either rescission or a reduction in the purchase/lease price of the Class Vehicles from Ford.

123.    Further, under Louisiana law, Ford is deemed to know that the Vehicles contained redhibitory defects pursuant to LA. CIV. CODE ART. 2545. Ford is liable for the bad faith sale of defective products with knowledge of the defects and thus is liable to Plaintiff and the Louisiana State Class for the price of the Vehicles, with interest from the purchase or lease date, as well as reasonable expenses occasioned by the sale or lease of the Vehicles, as well as attorneys' fees.

124.    Due to the defects and redhibitory vices in the Class Vehicles Plaintiffs and the Louisiana State Class members have suffered damages under Louisiana law.

## COUNT V
## Violation of the Maryland Consumer Protection Act
### (MD. CODE COM. LAW § 13-101, *et seq.*)

125.    Plaintiff Randy Transue (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Maryland State Class against Ford.

126.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

127.    Plaintiff, Ford, and the Maryland State Class members are "persons" within the meaning of MD. CODE COM. LAW § 13-101(h).

128.    The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged.  MD. CODE COM. LAW § 13-302.

129.    Ford violated the Maryland CPA by, at minimum: knowingly representing that Class Vehicles have uses and benefits which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease

them as advertised; representing that the subject of a transaction involving Class

Vehicles had been supplied in accordance with a previous representation when it

had not; and knowingly making other false representations in a transaction.

130.    Plaintiff and Maryland State Class members did not and could not

unravel Ford's deception on their own.

131.    Plaintiff and the Maryland State Class have suffered damages as a

direct and proximate result of Ford's violation of the Maryland CPA.  Had Plaintiff

and Maryland State Class members known the truth, they would not have

purchased the Class Vehicles or would have paid less for them.  They now own or

lease Class Vehicles that are worth less and cost more to drive and maintain than

the vehicles that were advertised or marketed.

### COUNT VI
### Violation of the Michigan Consumer Protection Act
### (MICH. COMP. LAWS § 445.903 *et seq.*)

132.    Plaintiff Brian Leja (for the purpose of this section, "Plaintiff") brings

this claim on behalf of himself and the Michigan State Class against Ford.

133.    Plaintiff incorporates by reference each preceding paragraph as

though fully set forth herein.

134.    Plaintiff and Michigan State Class members are "person[s]" within the

meaning of the MICH. COMP. LAWS § 445.902(1)(d).

135.    Ford is a "person" engaged in "trade or commerce" within the meaning of MICH. COMP. LAWS § 445.902(1)(d) and (g).

136.    The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  MICH. COMP. LAWS § 445.903(1).

137.    Ford violated the Michigan CPA by, at minimum: knowingly representing that Class Vehicles have uses and benefits which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

138.    Plaintiff and Michigan State Class members did not and could not unravel Ford's deception on their own.

139.    Plaintiff and the Michigan State Class suffered ascertainable loss and actual damages as a direct and proximate result of Ford's misrepresentations and its concealment of and failure to disclose material information.  Plaintiff and the Michigan State Class members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or would have paid significantly less for them had they known the truth.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

140.    Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Michigan Consumer Protection Act.

141.    Ford's violations present a continuing risk to Plaintiff and the Michigan State Class as well as to the general public.  Ford's unlawful acts and practices complained of herein affect the public interest.

142.    As a direct and proximate result of Ford's violations of the Michigan CPA, Plaintiff and the Michigan State Class have suffered injury-in-fact and/or actual damage.

143.    Plaintiff seeks injunctive relief to enjoin Ford from continuing its unfair and deceptive acts; monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages

in the amount of $250 for Plaintiffs and each Michigan State Class member;

reasonable attorneys' fees; and any other just and proper relief available under

MICH. COMP. LAWS § 445.911.

144.    Plaintiff also seeks punitive damages because Ford carried out

despicable conduct with willful and conscious disregard of the rights of others.

**COUNT VII**
**Michigan: Breach of Express Warranty**
**(MICH. COMP. LAWS §§ 440.2313 and 440.2860)**

145.    Plaintiff Brian Leja (for the purpose of this section, "Plaintiff") brings

this claim on behalf of himself and the Michigan State Class against Ford.

146.    Plaintiff incorporates by reference each preceding paragraph as

though fully set forth herein.

147.    Ford is and was at all relevant times a "merchant" with respect to

motor vehicles under MICH. COMP. LAWS § 440.2104(1) and "sellers" of motor

vehicles under § 440.2103(1)(c).

148.    With respect to leases, Ford is and was at all relevant times a "lessor"

of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

149.    The Class Vehicles are and were at all relevant times "goods" within

the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

150.    In selling and leasing the Class Vehicles, Ford expressly warranted in consumer-facing representations that the Class Vehicles achieved specific fuel economy.

151.    Ford provided these warranties to Plaintiff and the Michigan State Class members.

152.    Ford knew or should have known that the warranties were false and/or misleading because Ford was responsible for testing the Class Vehicles and determining their fuel economy rating in accordance with strict government standards, as described in detail above.

153.    Plaintiff and the Michigan State Class reasonably relied on Ford's express warranties concerning fuel economy when purchasing or leasing the Class Vehicles.  However, the Class Vehicles did not perform as warranted. Unbeknownst to Plaintiff and the Michigan State Class, the Class Vehicles did not achieve the fuel economy that Ford warranted.  Ford therefore breached its express warranties by providing a product containing defects that were never disclosed to Plaintiff or the Michigan State Class.

154.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the Michigan State Class suffered damages in an amount to be determined at trial.

## COUNT VIII
## Michigan: Breach of Implied Warranty of Merchantability
## (MICH. COMP. LAWS §§ 440.2314 and 440.2860)

155.    Plaintiff Brian Leja (for the purpose of this section, "Plaintiff") brings this claim on behalf of himself and the Michigan State Class against Ford.

156.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

157.    Ford was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS § 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

158.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under MICH. COMP. LAWS § 440.2803(1)(p).

159.    The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

160.    A warranty that the Class Vehicles are merchantable and conform to the promises or affirmations of fact is implied by law pursuant to MICH. COMP. LAWS §§ 440.2314 and 440.2862.

161.    Ford sold and/or leased Class Vehicles that were not in a merchantable condition because they do not conform to the promises Ford made regarding the Class Vehicles' fuel economy.

162.    Ford's breaches of the implied warranty of merchantability caused damage to the Plaintiff and the Michigan State Class in an amount to be proven at trial.

## COUNT IX
## Violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1973
### (MONT. CODE ANN. § 30-14-101 *et seq.*)

163.    This claim is brought by Plaintiff John Sautter (for the purpose of this section, "Plaintiff") on behalf of himself and the Montana State Class against Ford.

164.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

165.    Ford, Plaintiff, and Montana State Class members are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

166.    Plaintiff and Montana State Class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

167.    The sale or lease of each Class Vehicle at issue occurred through "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and Ford committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

168.    The Montana Unfair Trade Practices and Consumer Protection Act (Montana CPA) makes unlawful any "unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce."  MONT. CODE

ANN. § 30-14-103.

169.    Ford violated the Montana CPA by, at minimum: knowingly

representing that Class Vehicles have uses and benefits which they do not have;

representing that Class Vehicles are of a particular standard, quality, and grade

when they are not; advertising Class Vehicles with the intent not to sell or lease

them as advertised; representing that the subject of a transaction involving Class

Vehicles has been supplied in accordance with a previous representation when it

has not; and knowingly making other false representations in a transaction.

170.    Plaintiff and Montana State Class members did not and could not

unravel Ford's deception on their own.

171.    Plaintiff and the Montana State Class suffered ascertainable loss and

actual damages as a direct and proximate result of Ford's misrepresentations and

its concealment of and failure to disclose material information.  Had Plaintiff and

the Montana State Class known about Ford's conduct, they would not have

purchased or leased the Class Vehicles and/or would have paid significantly less

for them.  Plaintiff and the Montana State Class also suffered diminished value of

their vehicles, as well as lost or diminished use.

172.    Ford had an ongoing duty to all Ford customers to refrain from unfair

and deceptive practices under the Montana Consumer Protection Act.

173.    Ford's violations present a continuing risk to Plaintiff as well as to the general public.  Ford's unlawful acts and practices complained of herein affect the public interest.

174.    As a direct and proximate result of Ford's violations of the Montana CPA, Plaintiff and the Montana State Class have suffered injury-in-fact and/or actual damage.

175.    Because Ford's unlawful methods, acts, and practices have caused Montana State Class members to suffer an ascertainable loss of money and property, the Montana State Class seeks from Ford actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining Ford's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

### COUNT X
### Violation of the Nevada Deceptive Trade Practices Act
### (NEV. REV. STAT. § 598.0903 *et seq.*)

176.    This claim is brought by Plaintiff Stephen Mattson (for the purpose of this section, "Plaintiff") on behalf of himself and the Nevada State Class against Ford.

177.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

178.    Ford, Plaintiff, and Montana State Class members are "persons"

within the meaning of NEV. REV. STAT. ANN. § 598.0915.

179.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV.

REV. STAT. ANN.  § 598.0903, *et. seq*. prohibits deceptive trade practices. Under the

Nevada DTPA, a person engages in a "deceptive trade practice" if, in the course of

business or occupation, the person "[k]nowingly makes a false representation as to

the characteristics, ingredients, uses, benefits, alterations or quantities of goods or

services for sale or lease or a false representation as to the sponsorship, approval,

status, affiliation or connection of a person therewith"; "[r]epresents that goods or

services for sale or lease are of a particular standard, quality or grade, or that such

goods are of a particular style or model, if he or she knows or should know that

they are of another standard, quality, grade, style or model"; "[a]dvertises goods or

services with intent not to sell or lease them as advertised and certified"; or

"[k]nowingly makes any other false representation in a transaction."  NEV. REV.

STAT. ANN. §§ 598.0915–598.0925.

180.    Ford violated the Nevada DTPA by, at minimum: knowingly

representing that Class Vehicles have uses and benefits which they do not have;

representing that Class Vehicles are of a particular standard, quality, and grade

when they are not; advertising Class Vehicles with the intent not to sell or lease

them as advertised; representing that the subject of a transaction involving Class

Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

181.   Plaintiffs and Nevada State Class members did not and could not unravel Ford's deception on their own.

182.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

183.   Plaintiff and the Nevada State Class suffered ascertainable loss and actual damages as a direct and proximate result of Ford's misrepresentations and its concealment of and failure to disclose material information.  Had Plaintiff and the Nevada State Class known about Ford's conduct, they would not have purchased or leased the Class Vehicles and/or would have paid significantly less for them.  Plaintiff and the Class also suffered diminished value of their vehicles, as well as lost or diminished use.

184.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive acts or practices under the Nevada DTPA.

185.   Ford's violations present a continuing risk to Plaintiff and the Class as well as to the general public.  Ford's unlawful acts and practices complained of herein affect the public interest.

186.    As a direct and proximate result of Ford's violations of the Nevada DTPA, Plaintiff and the Nevada State Class have suffered injury-in-fact and/or actual damage.

187.    Accordingly, Plaintiff and the Nevada State Class seek their actual damages, punitive damages, an order enjoining Ford's deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

**COUNT XI**
**Violation of the Utah Consumer Sale Practices Act**
**(UTAH CODE ANN. § 13-11-1 *et seq*.)**

188.    This claim is brought by Plaintiff Al Balls (for the purpose of this section, "Plaintiff") on behalf of himself and the Utah State Class against Ford.

189.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

190.    Plaintiff and Utah State Class members are "persons" under the Utah Consumer Sales Practices Act ("Utah CSPA"), UTAH CODE § 13-11-3(5).

191.    The sales and leases of the Class Vehicles to the Plaintiffs and Utah State Class members were "consumer transactions" within the meaning of UTAH CODE § 13-11-3(2).

192.    Ford is a "supplier" within the meaning of UTAH CODE § 13-11-3(6).

193.    The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including but not limited to indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; and "indicat[ing] that a specific price advantage exists, if it does not." UTAH CODE ANN. § 13-11-4.

194.    Ford violated the Utah CSPA by, at minimum: knowingly representing that Class Vehicles have uses and benefits which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

195.    Plaintiff and Utah State Class members did not and could not unravel Ford's deception on their own.

196.    Additionally, Ford knew, or had reason to know, that consumers would rely on Ford's failure to disclose the defect.  Ford therefore engaged in an unconscionable act within the meaning of UTAH CODE ANN. § 13-11-5.

197.    Plaintiff and Utah State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Ford's misrepresentations and its concealment of and failure to disclose material information.  Had Plaintiff and the Utah State Class known about Ford's conduct, they would not have purchased or leased the Class Vehicles and/or would have paid significantly less for them.  Plaintiffs also suffered diminished value of their vehicles, as well as lost or diminished use.

198.    Defendants had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Utah CSPA in the course of its business.

199.    Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiff seeks monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

### COUNT XII
### Violation of the Washington Consumer Sale Practices Act
### (WASH. REV. CODE ANN. § 19.86.010, *et seq*.)

200.    Plaintiff Rick Shurtliff (for the purpose of this section, "Plaintiff") brings this action on behalf of himself and the Washington State Class against Ford.

201.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

202.    Ford, Plaintiff, and the Washington State Class are "persons" within the meaning of WASH. REV. CODE § 19.86.010(2).

203.    Ford is engaged in "trade" or "commerce" within the meaning of WASH. REV. CODE § 19.86.010(2).

204.    The Washington Consumer Protection Act ("Washington CPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  WASH. REV. CODE § 19.86.020.

205.    Ford violated the Washington CPA by, at minimum: knowingly representing that Class Vehicles have uses and benefits which they do not have; representing that Class Vehicles are of a particular standard, quality, and grade when they are not; advertising Class Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Class Vehicles has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

206.    Plaintiffs and Washington State Class members did not and could not unravel Ford's deception on their own.

207.    Ford had an ongoing duty to all its customers to refrain from unfair and deceptive practices under the Washington CPA in the course of its business.

208.    Ford's violations present a continuing risk to Plaintiff as well as to the general public.  Ford's unlawful acts and practices complained of herein affect the public interest.

209.    Had Plaintiff and the Washington State Class known about Ford's conduct, they would not have purchased or leased the Class Vehicles and/or would have paid significantly less for them.

210.    Pursuant to WASH. REV. CODE § 19.86.090, Plaintiff and the Washington State Class seek an order enjoining Ford's unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Washington CPA.  Because Ford's actions were willful and knowing, Plaintiffs' damages should be trebled.  *Id*.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action pursuant to one or more of the proposed Classes, as they may be modified or amended, and respectfully requests this Court:

A.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.      Appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

C.      Award damages, including compensatory and exemplary damages, to Plaintiffs and all other Class members;

D.      Award Plaintiffs and Class members such additional damages, over and above the amount of their actual damages, that are authorized and warranted by law, as applicable;

E.      Grant restitution to Plaintiffs and Class members and require Defendants to disgorge inequitable gains;

F.      Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Ford to adjust and correct the Class Vehicles' fuel economy labels and all representations about the Class Vehicles' fuel economy;

G.      Award Plaintiffs and Class members punitive damages;

H.      Award Plaintiffs and Class members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

I.      Award such other relief as this Court deems just and appropriate.

## IX.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  July 8, 2019         Respectfully submitted,

LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

By:      */s/ David S. Stellings*
         David S. Stellings
         Kara. I. McBride
         **LIEFF CABRASER HEIMANN &
         BERNSTEIN, LLP**
         250 Hudson Street, 8th Floor
         New York, NY 10013
         Telephone:  (212) 355-9500
         Facsimile:  (212) 3559592
         dstellings@lchb.com
         kmcbride@lchb.com

         Elizabeth J. Cabraser
         Kevin R. Budner
         Phong-Chau G. Nguyen
         Wilson M. Dunlavey
         **LIEFF CABRASER HEIMANN &
         BERNSTEIN, LLP**
         275 Battery Street, 29th Floor
         San Francisco, CA  94111-3339
         Telephone:  (415) 956-1000
         Facsimile:  (415) 956-1008
         ecabraser@lchb.com
         kbudner@lchb.com
         pgnguyen@lchb.com
         wdunlavey@lchb.com

Roland Tellis
David Fernandes
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone:  (214) 521-3605
Facsimile:  (214) 520-1181
rtellis@baronbudd.com
dfernandes@baronbudd.com

James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone:  (973) 944-1700
Facsimile:  (973) 994-1744
jcecchi@carellabyrne.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street
New York, NY  10005-4401
Telephone:  (212) 584-0700
Facsimile:  (212) 584-0799
cseeger@seegerweiss.com

ROSSMAN SAXE, P.C.
Mark C. Rossman (P63034)
Brian M. Saxe (P70046)
Linda J. Roelans (P82818)
2145 Crooks Road, Suite 220
Troy, Michigan 48084
Telephone: 248.385.5481
Facsimile: 248.480.4936
mark@rossmansaxe.com
brian@rossmansaxe.com
linda@rossmansaxe.com